IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 12, 2004 Session

## JOHN HENRY SPARROW, III v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Dickson County**
**No. CR6605     Robert E. Burch, Judge**

---

**No. M2004-00492-CCA-R3-PC - Filed December 10, 2004**

---

This is an appeal as of right from a denial of post-conviction relief. The Defendant, John Henry Sparrow, III, was convicted by jury verdict of attempted especially aggravated kidnaping and received a twelve year sentence. This Court upheld the Defendant's conviction on direct appeal. See State v. John Henry Sparrow, III, No. M2000-03238-CCA-R3-CD, 2002 WL 560958 (Tenn. Crim. App., Nashville, April 16, 2002) (not for citation).[1] The Defendant subsequently filed a petition for post-conviction relief, which was denied. The Defendant now appeals to this Court, raising the single issue of ineffective assistance of counsel. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOHN EVERETT WILLIAMS, J., joined.

T. Lance Carter, Fayetteville, Tennessee, for the appellant, John Henry Sparrow, III.

Paul G. Summers, Attorney General and Reporter; Richard H. Dunavant, Assistant Attorney General; Dan Alsobrooks, District Attorney General; and Carey J. Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1]"If an application for permission to appeal is hereafter denied by this Court with a 'Not for Citation' designation, the opinion of the intermediate appellate court has no precedential value." Tenn. R. S. Ct. 4(F)(1).

"An opinion so designated shall not be . . . cited by any judge in any trial or appellate court decision, or by any litigant in any brief, or other material presented to any court, except . . . when the opinion is relevant to a criminal, post-conviction or habeas corpus action involving the same defendant." Tenn. R. S. Ct. 4(F)(2).

# OPINION

# FACTS

The underlying facts of this case were described by this Court in the direct appeal opinion as follows:

On August 26, 1998, Carolyn Finch's two granddaughters, Josie Shepherd and Kaitlyn Christian, were visiting her at her apartment in Dickson County, Tennessee. Josie was about to turn four years old; her cousin Kaitlyn was eight years old. In the afternoon, Josie and Kaitlyn went to the playground at the apartment complex. A short time later, the two girls came rushing back into the apartment, slamming the door behind them. Ms. Finch testified that the girls were very frightened, upset and confused. When Ms. Finch asked them what was wrong, they told her that a man had tried to get them to leave the playground and go into the woods to play with snakes and turtles. She testified that the girls told her that, as they ran up the stairs to the apartment, the man had tried to grab Josie's foot. Ms. Finch subsequently contacted the police.

Kaitlyn testified at trial, explaining that she had been sitting on the playground fence while Josie was on the swings when a strange man came up behind her. She jumped off the fence and ran to stand next to Josie. The man asked them if they wanted to play snakes. Kaitlyn testified that she said, "no, how do you play?" She stated that the man told her, "you go in the woods and find all the snakes you can." She told the man that they didn't play with snakes. She stated that Josie then said, "come on, let's go inside." Kaitlyn testified that they ran to the stairs leading up to their grandmother's apartment and began going up the stairs. The man was "kind of jogging" toward the stairs, according to Kaitlyn, and when he got to the bottom of the stairs, commented, "I'm going to get you." She explained that he reached up and grabbed at Josie's ankle, but "barely touched it." Kaitlyn grabbed Josie and ran with her up the remaining steps and into the apartment.

Kaitlyn stated that she had never seen the man before and did not see him again. She was unable to identify him in court. She stated that the man at the playground had been wearing "a red Arizona T-shirt, a cap, [and] some baggy jeans." She also stated that "his eyes looked like they had soot on them."

Dustin Owen testified that he saw the Defendant walk by him at the apartment complex on August 26, 1998. Mr. Owen explained that soon thereafter he saw the Defendant drive by. Some days later he saw the Defendant in the complex again,

-2-

driving his car. He stated that the Defendant pulled in front of one of the buildings, turned around, and drove back out. He described the car as old and black with some sort of shade covering the back window.

Jessica Wood testified that she saw the Defendant talking to Kaitlyn while Kaitlyn was sitting on the playground fence. She stated that he was wearing a red hat and a red shirt. About one or two weeks later, she saw the Defendant at the complex again, when he drove in, turned around, and drove back out. He was wearing a black cowboy hat and a black shirt. She looked at the car's license plate number, memorized it, and wrote it down. She gave the number to the police, and remembered it at trial as 5DD452.

Michael Hugel testified that he had seen the Defendant coming up from the woods near the complex a couple of times. Tracy Fuller testified that she saw the Defendant near the woods at the same time Kaitlyn and Josie were in the playground.

On September 3, 1998, Detective John Patterson stopped the automobile the Defendant was driving because the brake lights weren't working, and because the car matched the description of the one reported in connection with this incident. The car was a black Nissan with window louvers in the rear hatchback. The license plate number was 50DV452. Detective Patterson did not question or arrest the Defendant but did ask him where he lived. The Defendant told him where he lived, adding that he lived with his fiancé, Edith Smith. Ms. Smith subsequently gave the police consent to search their apartment. During the search, the police recovered a red tee-shirt with the word "Arizona" on it, and a black cowboy hat.

Detective Patterson also showed a photographic lineup containing a photograph of the Defendant to several of the witnesses. Detective Patterson testified that Dustin Owen and Michael Hugel identified the Defendant in the lineup. However, Tracy Fuller and Jessica Wood did not identify the Defendant from the lineup.

On September 3, 1998, Detective Stewart Goodwin met with the Defendant and took his written statement. The statement reads as follows:

On the way from work in Ashland City at about 5:00 p.m. I decided to check out the apartments in Charlotte on Route 48. I had rode through before checking them out. I parked my car in front of the building on the right. I walked down to the office to ask about lease info. but no one was there. So I decided to walk through the apts. to see what I could. I noticed several kids playing outside, but especially two young girls climbing a fence around the playground and jumping off the other side toward the woods. I then spoke to the children in a loud voice saying "don't jump off that fence because you may get hurt, break a leg or arm or something." One girl said

-3-

"why." I asked if they had other games to play that were less dangerous. They asked "like what." I said I used to play a game called snake, would you like to play. They said how do you play. I said one person is the snake has to cover their eyes and count to 10 while the others (turtles) have to run and hide.  [T]he snake then tries to catch or tag the turtles. The girls showed no interest in the game.

I then asked while I was looking around if they had ever seen any snakes. One girl replyed [sic] that "My daddy has caught snakes." I then asked what he did to them. She replied "He killed them." I said that was crazy. The little girl said "I'm crazy." I said "How crazy are you?" She said "I would do anything." I said "thats pretty crazy allright." Then I started walking back around the apartment to go to my car. I saw the girls going home toward the front of the apartment. We passed again in the breezway. One of the girls kicked her leg at me from up above me in a playful gesture. So I returned playfully by swiping at her leg and sticking my toung[sic] out at her. [T]he two then ran up the rest of the stairs and slammed the apt. door. I kept walking to my car and left to go home. Yesterday, I turned around in the apt. parking lot to see other rental property I had passed about 3 miles before.

Edith Smith, who had been engaged to the Defendant in August 1998, testified on behalf of the Defendant. She explained that she and the Defendant had been living in Dickson at that time and that she had been interested in moving closer to Ashland City; hence, the Defendant's interest in looking at the apartment complex.

Nancy Sparrow, the Defendant's mother, also testified on the Defendant's behalf. She explained that, as a teenager, the Defendant had played a game called "snakes and turtles."

Sparrow, 2002 WL 560958, at *1-3.

At the March 2000 jury trial the State also called as a witness victim Josie Shepherd,[2] then approximately five years old.  The record reveals that when placed on the witness stand, the child was unable to respond to any questions asked of her and began to cry.  The trial judge excused the child and instructed the jury to disregard the fact that the witness was called.

At the post-conviction hearing, both the Defendant's former fiancé, Ms. Edith Griffith,[3] and his mother, Ms. Nancy Sparrow, testified that they spent very little time with the Defendant's trial counsel and were never asked if they knew why the Defendant was at the apartment complex

---

[2] The record on appeal contains several inconsistencies pertaining to the spelling of the youngest victim's name. The trial judge, in his memorandum denying post-conviction relief, refers to her as "Jody Shepherd" while the post-conviction hearing transcript and the Appellant's brief refer to her as "Josie Sheppard."  We use "Josie Shepherd," consistent with the spelling used in the direct appeal opinion.

[3] Ms. Edith Griffith was previously known as Ms. Edith Smith.

-4-

playground talking to small children. Ms. Griffith admitted to testifying at trial that she and the Defendant wanted to move to a different apartment complex, but stated that the Defendant's trial counsel never asked about--or presented to the jury--the fact that she had two handicapped children, they lived in cramped quarters with no nearby playground facilities or other children, and she and the Defendant wished to move to a new apartment complex with a proper play area and suitable neighborhood children who could befriend her special-needs children. She also testified that she specifically asked the Defendant to inspect the apartments where the crime occurred to determine their suitability for her children's needs. Ms. Nancy Sparrow testified that she also knew her son and Ms. Griffith were looking for a new apartment complex primarily because of the children's needs, and were interested in the apartments where the offense occurred, but that the Defendant's trial counsel never asked her about these facts. Ms. Sparrow further testified that the Defendant's trial counsel had never before met with her until the day of the trial when she was unexpectedly called as a witness.

The Defendant's father, Johnny Sparrow, testified at the post-conviction hearing concerning his observations at the trial when Josie Shepherd was put on the witness stand. He stated that when the five-year-old was questioned by the State she started crying. Mr. Sparrow further stated: "When that happened, my heart dropped to the floor. I felt right then and there that they were going to convict my son. I looked at the jurors faces, and I could see that they felt the emotion that I felt from the girl crying. I wanted to cry myself." Ms. Debbie Smith, the Victim-Witness Coordinator for the District Attorney's Office, testified that prior to the day of the trial she interviewed the child and took her to the courtroom for familiarization with the surroundings. Ms. Smith stated that the child did not exhibit any difficulty during the interview or display nervousness prior to being called to testify.

The Defendant's trial counsel, the father and son legal team of Dale and Kenneth Quillen, both testified at the post-conviction hearing. Dale Quillen, a 47-year veteran of the practice of law, testified that in preparing the case for trial he had not learned about the two handicapped children living with the Defendant and his fiancé, the cramped quarters, or lack of playground facilities. He stated that he did not know that both Ms. Griffith and Ms. Sparrow could have testified of these facts, thereby providing an explanation as to why the Defendant was at the apartment complex playground. He also stated that he considered the failure to learn this information and present it to the jury a "serious omission" and concluded that, in his opinion, it prejudiced the Defendant. He further testified that he and his son were "over confident" and therefore did not zealously advocate for their client as they should have.

Mr. Kenneth Quillen, trial co-counsel, also testified that he did not know about the facts to which Ms. Griffith and Ms. Sparrow could have testified. He further testified that when the crying child was removed from the courtroom at the trial he failed to preserve the juror's reaction for the record, and also failed to raise the issue on direct appeal. Mr. Kenneth Quillen conceded that Ms. Griffith did testify at trial that they were unhappy with their current living arrangement and had expressed interest in the very apartment complex where the offense occurred. During the course of his testimony, Mr. Kenneth Quillen admitted several times that he made mistakes which he believed

prejudiced the Defendant. When questioned by the State concerning other evidence presented at trial which strongly supported the jury's verdict of guilt, Mr. Kenneth Quillen remarked that "juries make mistakes," and, that in this case, "I think an innocent man was convicted."

The Defendant testified at the post-conviction hearing that during the course of one of several lengthy meetings he had with Dale Quillen, he informed his counsel in detail of his reason for checking out the playground facilities at the apartment complex where the offense occurred. Specifically, the defendant testified that he told his trial counsel:

> [W]e were living in a cramped area. I told him that they [Ms. Griffith's children] were mentally challenged. That we were looking for a place for them to go where they could play. The place we were living didn't have any place for them to go. They couldn't go out and play. The apartment manager where we were at wouldn't allow them out by themselves. There was no facilities for them there; and I wanted to get closer to work because I was working in Ashland City.

The Defendant also testified that he was advised by his counsel not to testify at the trial because of his prior criminal record.

In February of 2004, the court issued an order denying post-conviction relief. In a memorandum accompanying the order, the court stated that with regard to the reason why the Defendant was at the crime scene, "[m]ost of this evidence was, in fact, before the jury." The court found that the additional evidence that could have been provided by Ms. Griffith and Ms. Sparrow was "cumulative." The court further found that the failure of the child-witness to testify was unforseen, and properly handled when the judge excused the witness and instructed the jury to disregard her appearance in court, adding that "[t]his Court presumes that the jury followed that instruction." Thus, the court found that the child's appearance in court did not affect the outcome of the trial. After stating its findings of fact and conclusions of law, the trial court concluded that "the issue of ineffectiveness of counsel is without merit" and denied post-conviction relief. The Defendant timely appealed to this Court.

**ANALYSIS**

In his appeal from denial of post-conviction relief, the Defendant argues that he received ineffective assistance of counsel at his trial. The Defendant asserts that his trial attorneys were constitutionally deficient in two specific areas of his trial which led to actual prejudice: (1) his counsel failed to fully investigate the factual matters of the case and failed to elicit critical information from their own witnesses concerning the Defendant's reason for being at the crime scene, and (2) his counsel failed to note for the record the reaction of the jurors to the crying five-year-old witness and failed to argue this issue on direct appeal. We disagree.

## I. Post Conviction Standard of Review

To sustain a petition for post-conviction relief, a defendant must prove his or her factual allegations by clear and convincing evidence at an evidentiary hearing. See Tenn. Code Ann. § 40-30-110(f); Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. See Momon, 18 S.W.3d at 156; Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). The trial judge's findings of fact on a petition for post-conviction relief are afforded the weight of a jury verdict and are conclusive on appeal unless the evidence preponderates against those findings. See Momon, 18 S.W.3d at 156; Henley, 960 S.W.2d at 578.

## II. Ineffective Assistance of Counsel

Both the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Both the United States Supreme Court and the Tennessee Supreme Court have recognized that the right to such representation includes the right to "reasonably effective" assistance, that is, within the range of competence demanded of attorneys in criminal cases. See Strickland v. Washington, 466 U.S. 668, 687 (1984); Burns, 6 S.W.3d at 461; Baxter, 523 S.W.2d at 936.

A lawyer's assistance to his or her client is ineffective if the lawyer's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. This overall standard is comprised of two components: deficient performance by the defendant's lawyer, and actual prejudice to the defense caused by the deficient performance. See id. at 687; Burns, 6 S.W.3d at 461. The defendant bears the burden of establishing both of these components by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f); Burns, 6 S.W.3d at 461. The defendant's failure to prove either deficiency or prejudice is a sufficient basis upon which to deny relief on an ineffective assistance of counsel claim. See Burns, 6 S.W.3d at 461; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).

In evaluating a lawyer's performance, the reviewing court uses an objective standard of "reasonableness." See Strickland, 466 U.S. at 688; Burns, 6 S.W.3d at 462. The reviewing court must be highly deferential to counsel's choices "and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462; see also Strickland, 466 U.S. at 689. The court should not use the benefit of hindsight to second-guess trial strategy or to criticize counsel's tactics, see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982), and counsel's alleged errors should be judged in light of all the facts and circumstances as of the time they were made, see Strickland, 466 U.S. at 690; Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998).

A trial court's determination of an ineffective assistance of counsel claim presents a mixed question of law and fact on appeal. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). This

Court reviews the trial court's findings of fact with regard to the effectiveness of counsel under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. See id. "However, a trial court's conclusions of law--such as whether counsel's performance was deficient or whether that deficiency was prejudicial--are reviewed under a purely de novo standard, with no presumption of correctness given to the trial court's conclusions." Id.

### A. Inadequate investigation and witness preparation

The Defendant asserts that both Edith Griffith and Nancy Sparrow knew information that was "particularly relevant," and had they been properly questioned by trial counsel "there is a reasonable probability that the result would have been different." The Defendant points to evidence suggesting that his trial counsel failed to adequately investigate the facts of the case, failed to properly interrogate and question the Defendant's own witnesses, and most significantly, failed to elicit and present to the jury the critical information concerning the Defendant's explanation for why he was talking to children at the playground of the apartment complex. The record reveals that neither Ms. Griffith nor Ms. Sparrow had met the Defendant's trial counsel prior to the day they were placed on the witness stand, and neither was informed ahead of time that they would be asked to testify. Trial counsel did not discuss with Ms. Griffith what she was to testify about during trial, and never even asked Ms. Sparrow what she knew about the case before putting her on the stand. At the post-conviction hearing both Dale and Kenneth Quillen stated that they were deficient in their investigation and witness preparation, and that their failure to present the information that the two witnesses knew to the jury was not a strategic move but rather a "serious omission" on their part. They further stated that they believed their deficient representation did in fact prejudice the Defendant.

We indulge a "strong presumption that counsel's conduct falls within a wide range of professional conduct" that is "demanded of attorneys in criminal cases." Barr v. State, 910 S.W.2d 462, 464 (Tenn. Crim. App. 1995). However, the deference we afford to attorneys' strategic and tactical choices "only applies if the choices are informed ones based upon adequate preparation." Cooper v. Sate, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992); see also McBee v. State, 655 S.W.2d 191, 193 (Tenn. Crim. App. 1983) (holding that appellate courts "do not sit to second guess strategic and tactical choices made by trial counsel," but when those choices are "uninformed because of inadequate preparation, a defendant is denied effective assistance of counsel."). While not an inclusive list, this Court has previously observed that a defense attorney is "obliged to confer with his client, advise him of his rights, protect his rights, investigate the facts, and develop all substantial defenses." State v. Swanson, 680 S.W.2d 487, 490 (Tenn. Crim. App. 1984). Furthermore, our supreme court declared that "[f]ailure to conduct a reasonable investigation constitutes deficient performance," Burns, 6 S.W.3d at 462, and that a defense attorney is duty-bound to "investigate all apparently substantial defenses available to the defendant and must assert them in a proper and timely manner." House v. State, 44 S.W.3d 508, 515 (Tenn. 2001).

In this case, the Defendant has established his trial counsel's inadequate investigation and deficient witness preparation by clear and convincing evidence. After advising their client not to

take the stand himself, the Defendant's trial counsel called only two witnesses, Ms. Griffith and Ms. Sparrow. Counsel failed to properly inquire as to what these witnesses knew, failed to give them proper notice that they would be called to testify, failed to discuss what their testimony would be on the stand, and failed to have them explain to the jury the reason the Defendant was talking to children on the playground.

There is disagreement in the record as to whether trial counsel knew the details about Ms. Griffith's two children and their need for more suitable living arrangements. Both attorneys testified that they did not know of Ms. Griffith's children and their needs, while the Defendant testified that he fully advised his counsel of these pertinent facts. Nevertheless, the Defendant's trial counsel provided deficient representation under either scenario: if their client did not inform them of these facts, then their investigation was not "reasonable" and therefore "constitutes deficient performance," Burns, 6 S.W.3d at 462; however, if they were informed of these facts, they failed to pursue the obvious explanation for why the Defendant was at the crime scene talking to children and assert it "in a proper and timely manner," House, 44 S.W.3d at 515. In sum, we find that the Defendant's trial counsel provided deficient representation by failing to fully investigate the facts of the case, failing to properly interview and prepare their own witnesses, and for failing to elicit important testimony from the witnesses and present it to the jury in a proper and timely manner.

However, our inquiry does not stop at a finding of deficient representation, for it is well settled that to establish ineffective assistance of counsel the Defendant "bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad, 938 S.W.2d at 369 (emphasis added). Despite his trial counsel's errors, the Defendant has failed to establish prejudice by demonstrating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Id. at 370.

In order to "establish prejudice, the evidence stemming from failure to prepare a sound defense or present witnesses must be significant," though it need not follow that the "trial would have otherwise resulted in acquittal." State v. Zimmerman, 823 S.W.2d 220, 224 (Tenn Crim. App. 1991). The trial court found the evidence not elicited from the two witness to be merely "cumulative." The trial court discredited the Defendant's argument that had the jury known he had a reason for being at the apartment playground, they would have decided in his favor. Rather, the court concluded:

> Most of this evidence was, in fact, before the jury. At the trial, Edith Smith (now Griffith) testified that, prior to the event, she told Petitioner that she would like to live in the apartments in question (transcript, page 110). She also told the jury that she had small children. (transcript, page 111). The information which Petitioner insists should have been presented was cumulative. This Court cannot find by a preponderance of the evidence that it would have changed the outcome nor called into question the reliability of the result. [Internal citations refer to trial transcript].

Both this Court and our supreme court have consistently upheld trial court rulings denying post-conviction relief where the petitioner alleges ineffective assistance of counsel due to failure to

present testimony determined to be cumulative in nature. See Nichols v. State, 90 S.W.3d 576, 601 (Tenn. 2002) (holding defense counsel did not perform deficiently for failing to present additional mitigation witnesses at a penalty hearing where their testimony would have been cumulative to evidence already presented at the sentencing hearing); Howard Eugene Buchanan v. State, No. M2003-01815-CCA-R3-PC, 2004 WL 1114589, at *6 (Tenn. Crim. App., Nashville, May 19, 2004) (holding defense counsel was not ineffective for failing to call a particular witness because his "testimony was largely cumulative" to testimony that had already been presented).

In this case, while the Defendant's trial counsel failed to fully and clearly present the Defendant's explanation for why he was at the apartment complex playground talking to small children, the key facts comprising his reason for being at the crime scene were presented to the jury. Moreover, the "critical, relevant information" the Defendant now claims was never elicited from the witnesses would not have resolved many of the questions the State presented to the jury. While the omitted information may have suggested a more plausible explanation for the Defendant's presence at the playground, it fails to answer questions raised by the victims' testimony that the Defendant asked them to leave the playground and go into the woods to play "snakes and turtles." Likewise, it fails to account for Michael Hugel's testimony that he saw the Defendant coming up from the woods near the apartments several times. Most importantly, it fails to provide an explanation for why the Defendant chased the children, threatened them, and tried to grab the fleeing three-year-old victim by the ankle.

The post-conviction court determined that the omitted testimony would not have changed the outcome of the trial or called into question the reliability of the result, thus, the Defendant was not prejudiced. We are unable to conclude that the trial judge erred in reaching this conclusion. Accordingly, we find that the Defendant has not demonstrated by clear and convincing evidence that he was prejudiced by his trial counsel's deficient investigation or witness preparation.

### B.  Failure to preserve for the record and argue on appeal the issue of the child-witness

The Defendant claims his trial counsel provided ineffective assistance of counsel because they failed to preserve for the record the jury's reaction to the crying child-witness at trial, and also for failing to argue the child-witness issue on direct appeal. We disagree.

We note that the issue of possible prejudice to the jury due to the child-witness crying was adequately preserved in the record through defense counsel's motion for mistrial and the trial court's instructions to the jury. Counsel interrupted the trial proceedings, entered a motion for mistrial, and stated for the record: ". . . I think it prejudiced the jury to see this beautiful little girl there in her mother's arms . . . ." After his motion for mistrial was denied and the witness was dismissed, Counsel requested the trial court instruct the jury to disregard the child's appearance, which the court did, stating for the record: "It became obvious when [the child] came into the courtroom she was not going to be able to testify, so she didn't testify. . . . So as far as you are concerned, she gave no evidence." We find that the Defendant's trial counsel provided representation that was not deficient

with regard to the issue of preserving for the record the child-witness' crying in court as well as the defense's opinion that it "prejudiced the jury."

We also note that the post-conviction court found that the trial court properly dismissed the child as soon as it became apparent she could not testify and instructed the jury to disregard the child's appearance. The post-conviction court correctly noted that the jury is presumed to have followed the court's instructions, thereby precluding any prejudice against the defendant.

At the post-conviction hearing Mr. Kenneth Quillen testified that he and his father made the strategic decision to not appeal the issue of the child-witness crying. This Court has stated that failure to preserve or assert all arguable issue on appeal is not ineffective assistance of counsel, because failure to do so may be part of counsel's strategy of defense. See Swanson, 680 S.W.2d at 492. Moreover, it has long been established that this Court "will not attempt to second guess counsel" on matters of "strategy and tactics." State v. Martin, 627 S.W.2d 139, 142 (Tenn. Crim. App. 1981). Therefore, we find the Defendant has failed to demonstrate that his trial counsel's failure to argue on appeal the issue of the crying child-witness was either deficient representation or that it led to prejudice. The Defendant's claim of ineffective assistance of counsel is without merit.

## CONCLUSION

Finding no error, we affirm the judgment of the post-conviction court denying the defendant post-conviction relief.

_____
DAVID H. WELLES, JUDGE